# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 20-0334** (Summers County CC-45-2019-F-7)

**Jerry Mark Moul,**
**Defendant Below, Petitioner**


## MEMORANDUM DECISION


Petitioner Jerry Mark Moul, by counsel Kenneth E. Chittum, appeals the Circuit Court of Summers County's February 12, 2020, order sentencing him to consecutive terms of incarceration of not less than one nor more than five years for each of his two convictions of possession of a controlled substance with the intent to deliver. Respondent State of West Virginia, by counsel Patrick Morrisey and Mary Beth Niday, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

At approximately 1:50 a.m. on February 17, 2019, Deputy J.C. Wheeler of the Summers County Sheriff's Office and his K-9, Mac, were patrolling Hinton, West Virginia, in Summers County. Deputy Wheeler observed petitioner approximately 100 yards ahead of him on Route 3 fail to use a turn signal before abruptly turning into a gas station parking lot. The officer initiated a traffic stop. While the officer was running petitioner's information, he asked for consent to search petitioner's vehicle or to allow his K-9 to conduct a sniff. Petitioner consented. During K-9 Mac's sniff of petitioner's vehicle, the dog signaled the presence of drugs on the back of the driver's side door, so Deputy Wheeler searched the vehicle and found a bag containing methamphetamine and paraphernalia, and, in a separate part of the car, Deputy Wheeler found a bottle of Suboxone. Petitioner was placed under arrest and later indicted on two counts of possession of a controlled substance with intent to deliver. One count was predicated on the methamphetamine, and the other was predicated on the Suboxone.

Petitioner filed a motion to suppress the fruits of what he contended was the State's illegal search and seizure. Petitioner argued that Deputy Wheeler did not have probable cause or

1

reasonable suspicion to stop his vehicle and claimed that "[t]his very situation" was addressed in *Clower v. West Virginia Department of Motor Vehicles*, where this Court held that the officer, following approximately two city blocks behind the driver, did not have reasonable suspicion to initiate a traffic stop for the driver's failure to signal his turn at an intersection.[1] 223 W. Va. 535, 544, 678 S.E.2d 41, 50 (2009).

The parties appeared for a hearing on petitioner's motion. Petitioner reiterated that *Clower* was controlling as Deputy Wheeler was approximately 100 yards behind petitioner and there was no other traffic on the road. The State countered that, according to Deputy Wheeler, petitioner's turn was "abrupt[]" and an apparent attempt "to avoid or elude him." The State also highlighted that whereas the driver in *Clower* turned onto another street, petitioner turned abruptly into a private parking lot.

The court denied petitioner's motion. It found that petitioner "veered off into a gas station when Deputy Wheeler was within one hundred yards of the vehicle," and "[i]t is certainly possible that the right turn affected Deputy Wheeler." The court was not persuaded by petitioner's attempt to compare the facts of this case to those in *Clower* because the driver in *Clower* was two blocks ahead of the officer, the driver made a turn from one street onto another, and the officer had to speed up to catch the driver and initiate the stop. *Id.* at 537, 678 S.E.2d at 43. Therefore, the court concluded that Deputy Wheeler's stop was based on a reasonable suspicion that petitioner had committed a traffic offense.

Petitioner was tried on December 11, 2020. Deputy Wheeler testified that during his search of petitioner's vehicle he found "a black bag which contained scales, baggies and methamphetamine . . . directly behind the driver's seat on top of some items, as though it was tossed back there whenever I was attempting to make a stop." In addition, "in the center area of the vehicle was an orangish-yellow pill bottle which contained Suboxone." Deputy Wheeler testified that the scales found in petitioner's car were not of the sort found in kitchens but were like those typically used in the distribution of controlled substances. Deputy Wheeler also testified that the baggies found "have a zipper or a seal that would be on top of them, some of which are clear plastic bags, some of which have some black markings and also which have some red markings on it."[2] Like the scales, he testified that these types of bags are commonly seen in the distribution of controlled substances. The officer testified that he found nothing in the car consistent with the personal use of methamphetamine.

Deputy Wheeler further testified that the Suboxone pills, of which there were nine, were in a bottle labeled as prescribed to Tina Gunnoe.[3] Petitioner, who was alone when the officer

---

[1] Petitioner also moved to suppress on the ground that the dog sniff enlarged the traffic stop without reasonable suspicion. Petitioner does not assert error in the court's denial of his motion on that ground.

[2] Some of the baggies were "marked with a repeating black pattern with the words, 'Stay high' on a red background."

[3] The label was worn and, as the officer described it, "[f]or the most part, unreadable."

stopped him, informed the officer that Ms. Gunnoe was his landlord and that she had inadvertently left her pills in his vehicle. With final regard to the evidence obtained from petitioner's car, Deputy Wheeler described two pieces of paper reflecting petitioner's negative drug screens, including negative for methamphetamine and Suboxone, on February 12, 2019, and February 14, 2019.

Deputy Wheeler recounted that, after arresting petitioner and transporting him to the Sheriff's Office, he searched petitioner and asked him whether he had anything else on his person. Petitioner handed the officer a "bag of sorts with a substance inside" that petitioner had had in his shoe. The officer found a spoon that "would be used as a scoop to scoop out controlled substances" in that bag.

In petitioner's statement to Deputy Wheeler, he claimed to have been driving to meet or pick up a woman immediately prior to his arrest. Petitioner was initially "unsure" of the woman's name. Petitioner acknowledged that one of the substances in his car was methamphetamine, though he denied selling it, claiming only that he was an addict. The officer discounted petitioner's claim that the drugs were for his personal use due to petitioner "having packages of drugs, along with numerous empty baggies marked with different lingo. They're pictures, and also a set of scales. That would make a delivery scheme of everything." Deputy Wheeler also testified that the scoop was of the sort "consistently found as evidence in the delivery of controlled substances." Deputy Wheeler testified that petitioner had no lighters, foils, used baggies, or anything consistent with personal drug use.

On cross-examination, Deputy Wheeler acknowledged that the paraphernalia he described was indicative of the sale of methamphetamine in particular, and he found no such indicia of the sale of Suboxone pills.

After the State rested, petitioner moved for a directed verdict or judgment of acquittal as to Count II, pertaining to the Suboxone.[4] Petitioner argued that "there's no evidence, one, of any intent to distribute pills whatsoever; and, two, there's not even been any evidence of any illicit possession of those pills."[5] The court denied the motion, finding that "[t]here's enough evidence to go to the jury on it."

Tina Gunnoe, petitioner's landlord, testified that she lives in Virginia but returns to West Virginia to visit family and check on her property. On one occasion when she was in West Virginia, petitioner drove her to a convenience store to buy a pack of cigarettes, and she claimed that during that ride, she inadvertently dropped her lawfully prescribed Suboxone pills in petitioner's car. Not realizing her mistake until she was on her way back to Virginia, she called petitioner to confirm

---

[4] Before the State rested, it also presented the testimony of Courtney Miller, who is employed in the Seized Drug Section of the West Virginia State Police Forensic Laboratory. Ms. Miller analyzed the drugs found in petitioner's vehicle and testified to the results obtained from those analyses.

[5] Petitioner also moved for judgment of acquittal on Count I, but he does not challenge the court's denial of his motion as to that Count on appeal.

that her pills were in his car and to ask that he keep them until she returned to West Virginia, which petitioner agreed to do.

Petitioner testified and claimed that the Suboxone pills belonged to Ms. Gunnoe. He denied selling or giving the pills away, and he claimed that the methamphetamine was for his personal use. Petitioner further claimed that he had the methamphetamine in separate bags because he "was getting low on what I had that I was using, so I got some more." Petitioner explained that he carried scales to avoid "getting ripped off," as had happened in the past, and that he had small baggies because he preferred to transfer his methamphetamine from the packaging in which it was purchased to those baggies so he could "get to it easier to use."

Ultimately, the jury found petitioner guilty of each count charged in the indictment, and petitioner appeared for sentencing on February 7, 2020. Petitioner renewed his motion for judgment of acquittal, arguing that "the traffic stop resulted in illegal evidence that . . . constituted the entirety of the State's case." Petitioner also reiterated his arguments regarding dismissal of Count II (Suboxone). The court denied this motion and then sentenced petitioner to consecutive terms of not less than one nor more than five years of incarceration for each conviction. The court entered its sentencing order memorializing these rulings on February 12, 2020, and it is from this order that petitioner appeals.

In petitioner's first assignment of error, he argues that the circuit court erred in denying his motion to suppress because the officer did not have an articulable suspicion of wrongdoing at the time of the traffic stop. Petitioner again analogizes the facts of his case to *Clower* and maintains there was no reasonable suspicion that he had committed a traffic offense because he was not required to use a turn signal.

This Court's standard of review for a denial of a motion to suppress is as follows:

[W]e first review a circuit court's findings of fact when ruling on a motion to suppress evidence under the clearly erroneous standard. Second, we review *de novo* questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action. Under the clearly erroneous standard, a circuit court's decision ordinarily will be affirmed unless it is unsupported by substantial evidence; based on an erroneous interpretation of applicable law; or, in light of the entire record, this Court is left with a firm and definite conviction that a mistake has been made. . . . When we review the denial of a motion to suppress, we consider the evidence in the light most favorable to the prosecution.

*State v. Farley*, 230 W. Va. 193, 196, 737 S.E.2d 90, 93 (2012) (citations omitted). In addition,

[w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the

opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

With respect to the stop of petitioner's vehicle, we have held that "[p]olice officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime[.]" *Clower*, 223 W. Va. at 536, 678 S.E.2d at 42, Syl. Pt. 4 (citing Syl. Pt. 1, in part, *State v. Stuart*, 192 W. Va. 428, 452 S.E.2d 886 (1994)). This determination must be made by "examin[ing] the totality of the circumstances, . . . includ[ing] both the quantity and quality of the information known by the police." *Id.* at 536-37, 678 S.E.2d at 42-43, Syl. Pt. 5, in part (citing *Stuart*, 192 W. Va. at 429, 452 S.E.2d at 887, Syl. Pt. 2, in part).

In *Clower*, we held in Syllabus Point 3 that

[a] motorist who makes a turn at an intersection without first using a turn signal to notify others of the intent to make the turn does not violate the provisions of *W. Va.Code*, 17C-8-9 [1951], read in *para materia* with the provisions of *W. Va.Code*, 17C-8-8(a) [1999], where no other traffic may be affected by the movement of the motorist's vehicle.[6]

223 W. Va. at 536, 678 S.E.2d at 42. In reaching this holding, we observed that

the clear legislative intent behind the requirement of using a turn signal is to warn others of the motorist's intent to make a turn; however, the Legislature also clearly intended to qualify the requirement that a motorist use a turn signal to those occasions where others could be affected by the turning vehicle.

*Id.* at 540, 678 S.E.2d at 46.

Applying Syllabus Point 3, we found that the officer in *Clower*, whose "sole justification" for the stop was the driver's failure to signal his turn at an intersection, was not affected by that failure where the officer was approximately two city blocks behind the driver and the officer and driver were the only vehicles on the road. *Id.* at 537, 678 S.E.2d at 43. In addition, the officer had to speed up to reach the driver and followed him for approximately three blocks before initiating the stop. *Id.* at 537, 678 S.E.2d at 43. Consequently, the officer's stop of the driver's vehicle was not justified, and the officer had no reasonable, articulable suspicion to believe that the driver had committed a misdemeanor traffic offense. *Id.* at 543, 678 S.E.2d at 49.

---

[6] West Virginia Code § 17C-8-8 provides, in part, that "[n]o person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other traffic may be affected by such movement." West Virginia Code § 17C-8-9 provides, in part, that "[a]ny stop or turn signal when required herein shall be given either by means of the hand and arm or by a signal lamp or lamps or mechanical signal device."

The circumstances presented here—construed in the light most favorable to the State—are distinguishable from those presented in *Clower* and take this case outside the reach of the point of law on which petitioner relies. In particular, Syllabus Point 3 pertains to "[a] motorist who makes a turn at an intersection," and petitioner did not turn at an intersection.[7] *Id.* at 536, 678 S.E.2d at 42. Rather, he unpredictably "veered off" the road into a gas station parking lot in an apparent attempt to avoid or evade Deputy Wheeler, who was closer to petitioner when petitioner failed to signal this abrupt turn than the officer was to the driver in *Clower*. Under these circumstances, even assuming the applicability of Syllabus Point 3 of *Clower*, it cannot be said that the use of a turn signal would have served no purpose. *See id.* at 540, 678 S.E.2d at 46 (recounting the Legislature's understanding that in some situations, namely, when "no other traffic may be affected by the movement," a turn signal would serve no purpose). To the contrary, a situation in which one suddenly and unexpectedly turns off the street is the precise situation where a warning (i.e., turn signal) is necessary to those following behind. Thus, it cannot be said here—where Deputy Wheeler was following closely enough that petitioner apparently felt the need to try to dodge the officer—that "no other traffic may be affected by the movement." *Id.* at 536, 678 S.E.2d at 42, Syl. Pt. 3, in part. As a result, the petitioner's failure to use his turn signal gave Deputy Wheeler reasonable suspicion to believe that petitioner had committed a traffic offense in his presence, and the officer's stop of petitioner's vehicle was therefore justified.

In petitioner's last assignment of error, he asserts that the court erred in denying his motion for judgment of acquittal on the count related to the Suboxone because the State "merely established that [S]uboxone was found in a properly prescribed medicine bottle in the rear seat floor of [p]etitioner's vehicle." He concedes that the State presented a prima facie case of possession, but he argues that there was no evidence of intent to deliver the Suboxone.

"The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W. Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citation omitted). And in reviewing the sufficiency of the evidence,

---

[7] West Virginia Code § 17C-1-42 provides that

"[i]ntersection" includes: (a) The area embraced within the prolongation or connection of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways of two highways which join one another at, or approximately at, right angles, or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict; and

(b) Where a highway includes two roadways thirty feet or more apart, then every crossing of each roadway of such divided highway by an intersection highway shall be regarded as a separate intersection. In the event such intersecting highway also includes two roadways thirty feet or more apart, then every crossing of two roadways of such highways shall be regarded as a separate intersection.

Petitioner has not disputed that the turn did not occur at an intersection.

6

[t]he function of an appellate court . . . is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.* at 494, 711 S.E.2d at 564, Syl. Pt. 1, in part (citing Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995)). In addition, this Court

must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court.

*Id.*, Syl. Pt. 2, in part (citing *Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part). Of course, one challenging the sufficiency of the evidence "takes on a heavy burden." *Id.*

The State's evidence was that nine Suboxone pills, which had not been prescribed to petitioner, were found in petitioner's car when he was out in the early morning hours purportedly to meet a woman whose name he initially did not know. Along with these pills, Deputy Wheeler found other drugs, scales, and baggies in petitioner's car. "Most courts have held that possession with intent to deliver a controlled substance can be proven by establishing a number of circumstances among which are the quantity of the controlled substance possessed and the presence of other paraphernalia customarily used in the packaging and delivery of controlled substances." Syl. Pt. 4, *State v. Drake*, 170 W. Va. 169, 291 S.E.2d 484 (1982). Indeed, "quantity, standing alone, is evidence of intent to deliver." *Id.* at 172, 291 S.E.2d at 488. Further, "[t]he question of whether a person possesses a controlled substance with intent to . . . deliver is a jury question to be determined like other questions of intent from all the surrounding facts and circumstances." *Id.* at 173, 291 S.E.2d at 488. The quantity of Suboxone pills petitioner had alone is evidence that he intended to distribute the pills. Plus, petitioner had other drugs and paraphernalia that made it appropriate for the jury to pass on the question of intent. Accordingly, we find no error in the court's denial of petitioner's motion for a directed verdict.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** January 18, 2022

7

**CONCURRED IN BY:**

Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins

**DISSENTING:**

Chief Justice John A. Hutchison
Justice William R. Wooton

Hutchison, Chief Justice, dissenting:

I dissent to the majority's resolution of this case. I would have set this case for oral argument to thoroughly address the error alleged in this appeal. Having reviewed the parties' briefs and the issues raised therein, I believe a formal opinion of this Court was warranted—not a memorandum decision. Accordingly, I respectfully dissent.

Wooton, Justice, dissenting:

I respectfully dissent, as I believe the majority has sub silentio modified – indeed, effectively overruled – the bright-line rule established in *Clower v. West Virginia Dep't of Motor Vehicles*, 223 W. Va. 535, 678 S.E.2d 41 (2009):

> A motorist who makes a turn at an intersection without first using a turn signal to notify others of the intent to make the turn does not violate the provisions of W. Va. Code, 17C-8-9 [1951], read in para (sic) materia with the provisions of W. Va. Code, 17C-8-8(a) [1999], where no other traffic may be affected by the movement of the motorist's vehicle.

*Id*. at 536, 678 S.E.2d at 42, Syl. Pt. 3. This is exactly what the petitioner did in the instant case: he made a right-hand turn into a gas station parking lot at approximately 1:50 a.m., when the only other motorist on that stretch of Route 3 was the deputy sheriff who initiated a traffic stop on the sole ground that the petitioner had not used a turn signal.

The majority affirms the judgment of the circuit court, which found that *Clower* was distinguishable because the officer was travelling 100 feet behind the petitioner rather than two blocks behind him; the right-hand turn was "abrupt;" and the turn was made into a parking lot rather than into another street.[8] Nothing in *Clower* suggests that these factors are material; rather,

_____

[8] The majority further notes the court's finding that "[i]t is certainly *possible* that the right turn affected Deputy Wheeler." (Emphasis supplied). If this rank speculation is accepted as a legitimate rationale for distinguishing *Clower,* it will be the exception that entirely swallows the rule.

8

the sole factor to be considered is whether it can be said that "no other traffic may be affected by the movement of the motorist's vehicle."

In my view, the petitioner's motion to suppress should have been granted because the stop of his vehicle was clearly pretextual. Although it is always tempting to view these issues through the lens of what happened next – drugs and paraphernalia were found – this Court should not take its eye off the ball: the deputy had no probable cause to stop the petitioner's vehicle, and thus the search violated his rights under article III, section six of the West Virginia Constitution.

Without question, the scourge of illicit drug use is one of the greatest problems facing this state, and the nation. But we cannot allow our zeal to combat this scourge to undermine the fundamental rights enshrined in our constitution. While every branch of government shares that responsibility, the judicial branch has special responsibility with respect to constitutional rights.

In addition, I respectfully dissent from the majority's affirmance of the petitioner's conviction on the charge of possession with intent to distribute Suboxone. In this regard, a prescription bottle found in the petitioner's vehicle contained nine pills.[9] The only evidence offered by the State (other than the bottle containing the nine pills) was that five days and then again three days prior to his arrest, the petitioner had drug screens that were negative for Suboxone.

On this manifestly inadequate evidence, no jury could rationally conclude beyond a reasonable doubt that the petitioner possessed the Suboxone with intent to distribute it. And no jury should have been given the opportunity to even consider this count of the indictment, as the petitioner was entitled to judgment of acquittal at the close of the State's evidence.

For the foregoing reasons, I respectfully dissent.

---

[9] The label on the bottle indicated that the Suboxone was prescribed for Tina Gunnoe, who was identified as the petitioner's landlord. Both the petitioner and Ms. Gunnoe testified that she had left the pills in the petitioner's car; however, viewing the evidence in a light most favorable to the verdict winner, *see, e.g., State v. Fiske*, 216 W. Va. 365, 367, 607 S.E.2d 471, 473 (2004), we must assume that the jury disbelieved this testimony.